IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

JANNETTE NEAL                                          PLAINTIFF

     v.              Case No. 10-3010

HARTFORD LIFE GROUP
INSURANCE COMPANY                                      DEFENDANT

<u>**MEMORANDUM OPINION AND ORDER**</u>

Now on this  2nd  day of March, 2011, this cause comes on for consideration and decision and the Court, being well and sufficiently advised, finds and orders as follows:

1.  Plaintiff brings this action pursuant to the provisions of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, challenging the decision to deny her long-term disability benefits.

The parties have submitted a stipulated administrative record (the "AR") (Doc. 10) for the Court's review.

2.   Currently before the Court is the plaintiff's **Motion for Summary Judgment (Doc. 11),** which will be treated as a motion for entry of judgment, and **Hartford Life and Accident Insurance Company's Response to Jannette Neal's Motion for Summary Judgment and Cross-Motion for Judgment on ERISA Administrative Record (doc. 14).**  Both motions have been fully briefed and they are ripe for determination.

1

3.   **Background** -- The Court notes the following information as background for its analysis of plaintiff's claim:

(a)   Plaintiff worked for Baxter Healthcare Corporation ("Baxter") for over 32 years, beginning in 1974.

(b)   By 2006, plaintiff was employed as an Operator, an assembly-line position.  The position required her to stand, walk, bend, squat, kneel, use both hands, and lift up to 50 pounds or greater, all on a constant basis.

(c)   Plaintiff participated in an employee benefits plan.  The group disability plan was funded by a group policy (the "policy"), policy number SR-83079247, issued by Hartford Life and Accident Insurance Company (the predecessor to the defendant, Hartford Life Group Insurance Company) to the policy holder, Baxter International, Inc.

(d)   Plaintiff stopped work on September 6, 2006.  She applied for and received short term disability benefits from September 8, 2006 until March 22, 2007.

(e)   In February of 2007, the plaintiff notified Hartford that she was approved for Social Security Disability.  Hartford adjusted the amount of plaintiff's benefits under the policy to reflect the amount she was receiving for Social Security Disability.

(f)   Plaintiff applied for and received long-term disability benefits from March 23, 2007 until May 16, 2008.  Hartford approved

plaintiff's long-term disability benefits under the "own occupation" standard.

(g)  At the time her long-term disability benefits began, Hartford explained to the plaintiff that if she wished to receive benefits beyond March 23, 2008 (a 12-month period), she would have to be disabled under the Policy's "any occupation" standard.

(h)  In March of 2008, Hartford wrote to the plaintiff and reminded her that to receive benefits beyond March 23, 2008, she would need to qualify under the policy's "any occupation" standard. Hartford further advised the plaintiff that it was still investigating whether she was disabled under the "any occupation" standard and that the payment of "benefits beyond 3/22/2008 should not be construed as an admission of continued liability."

(i)  Hartford wrote to the plaintiff and advised her that her benefits would terminate effective May 16, 2008.  Hartford denied further benefits based on the "any occupation" definition of disability, explaining that it concluded that plaintiff was "not disabled from performing the material and substantial duties of any occupation for which [she was] qualified by education, training, or experience."

(j)  The terms of the policy define *disability* as follows:

*Disability* or *Disabled* means that *You* satisfy the Occupation Qualifier or the Earnings Qualifier as defined below.

**Occupation Qualifier**

*Disability* means that during the *Elimination Period* and the following 12 months, *Injury* or *Sickness* causes physical or mental impairment to such a degree of severity that *You* are:

   1) continuously unable to perform the *Material and Substantial Duties* of *Your Regular Occupation*; and
   2) not *Gainfully Employed*.

   After the *LTD Monthly Benefit* has been payable for 12 months, *Disability* means that *Injury* or *Sickness* causes physical or mental impairment to such a degree of severity that *You* are:

   1) continuously unable to engage in any occupation for which *You* are or become qualified by education, training or experience; and
   2) not *Gainfully Employed*. . . .

   (k)  The policy gives Hartford "sole discretionary authority . . . to determine . . . eligibility for benefits and to interpret the terms and provisions of the Policy."

   4.  **Evidence in Administrative Record** -- The evidence included in the administrative record reflects the following:

   *    The plaintiff submitted her claim for long term disability benefits in February of 2007.

   *    Dr. Richard Burnett completed an Attending Physician's Statement of Continuing Disability, reporting diagnoses of degenerative disc disease, spinal stenosis, and foraminal stenosis. Dr. Burnett noted that the plaintiff had been treated with epidural steroid injections and stated that the plaintiff was unable to stand, walk, sit, lift, carry, reach, push, pull, drive, or use a keyboard.  Dr. Burnett further stated that he believed the plaintiff's limitations would last a "lifetime."

4

\*     In March of 2007, Hartford approved the plaintiff's long-term disability benefits under the "own occupation" standard.

\*     Hartford advised plaintiff that her benefits would begin effective March 23, 2007, and would continue for a period of 12 months.  Hartford further advised plaintiff that if she wished to receive benefits beyond March 23, 2008, she would have to be disabled under the Policy's "any occupation" standard.

\*     The plaintiff returned to Dr. Burnett in April of 2007, complaining of neck pain.  Dr. Burnett prescribed Darvocet and physical therapy.

\*     In June of 2007, Dr. Burnett advised Hartford that the plaintiff was "not capable of performing full time work."  Dr. Burnett noted that plaintiff's condition was stable and that she was undergoing conservative treatment.

\*     In June of 2007, plaintiff identified her medications as Flexeril, Nexium, Evista, Singulair, and Lorazepam.  She described her pain as constant and reported that she had quit physical therapy because "it was increasing the pain."  Plaintiff opined that she would never return to work, even in a sedentary position.

\*     Plaintiff visited Dr. Burnett in July of 2007, complaining of "back and neck pain."  Dr. Burnett scheduled an MRI for August of 2007.

\*     The MRI, performed on August 9, 2007, noted the plaintiff's cervical spine "aligned essentially straight" with "no

5

apparent fracture, subluxation, or destructive lesion." "The C2-C3 and C3-C4 levels are relatively unremarkable . . . with mild posterior disc bulging with some spurring at C4-C5 with mild spinal stenosis." At C5-C6 , the MRI noted "a concentric disc bulge with some end plate spurring resulting in moderate spinal stenosis." At C6-C7, the MRI noted "a concentric disc bulge, a little more prominent to the left with moderate spinal stenosis." "At C7-T1, there is a broad-based posterior disc bulge, asymmetric to the right . . . [causing] an impression on the thecal sac with mild spinal stenosis" that appeared "fairly stable." The MRI noted "no definite acute disc herniation . . . [and] no significant foraminal stenosis." "The cervical spinal cord is otherwise unremarkable." The reviewing physician identified "[n]o significant change compared to the December 2006 MRI." Further, the lumbar spine also had "[n]o significant abnormality."

      *   Plaintiff returned to Dr. Burnett on August 17, 2007, to follow up on her back and neck pain. Plaintiff also complained of bowel and bladder problems. Dr. Burnett noted a history of gastroesophageal reflux disease. Plaintiff underwent a stool test, which proved negative for pathogens.

      *   Plaintiff saw a physician's assistant at Ozark Neurosurgical Associates in September of 2007. Plaintiff complained of back and neck pain, and noted a history of cholelithiasis (gallstones), GERD, renal stones, osteoporosis, and seasonal

allergies.  Plaintiff stated that her neck pain had "progressively worsened" and that it extended into her shoulders bilaterally and into the inner aspect of the arms to the thumbs bilaterally."  She stated that physical therapy did not help but that the two steroid injections had helped.  An x-ray of the plaintiff's back showed a "normal alignment of the vertebral bodies with no spondlylolisthesis," "[m]ild dis[c] height loss" "at C6-7 with endplate spurs," and "[m]ild endplate spurs" "at C5-6 and C7-T1." The reviewing physician's impressions included "degenerative disk disease at C6-7" and "no cervical motion abnormality."

    *    In October of 2007, plaintiff returned to Dr. Burnett, complaining of frequent diarrhea and abdominal pain.  Plaintiff underwent another stool test, which was "negative for clostridium difficile toxin A and/or B."

    *    Plaintiff returned to Dr. Burnett in late October of 2007 and on November 9, 2007.  Both times plaintiff noted that her diarrhea continued but had decreased and that she continued to have neck pain.

    *    In October of 2007, plaintiff completed Hartford's Claimant Questionnaire.  Plaintiff stated that she was unable to lift over 10 pounds and that her neck pain keeps her from doing many things she would like to do during the day.  Plaintiff stated that she had to rest during the day because she could not sleep well at night from pain.  She reported that she had "more problems

7

with bowels." As a typical day, plaintiff stated: "Get up when able sometimes its 9 or 10 a.m., then I will have to lay down again during the day. See doctors, pain med. & muscle relaxer, stay home, most of time." She stated that she would "try to go to church." She also stated that she did not "always make it to the bathroom with bladder & bowel." She stated that she needed assistance to bathe, dress, and use the toilet but acknowledged that she could feed herself and transfer from bed to chair without assistance.

     * Plaintiff also submitted Hartford's Attending Physician's Statement of Functionality completed by Dr. Burnett. Dr. Burnett noted diagnoses of degenerative disc disease and stenosis and reported that plaintiff complained of pain, tenderness, and a decrease in her range of motion. Dr. Burnett said that plaintiff was unable to lift anything, drive, bend, or reach and that these restrictions would last for her "lifetime."

     * Crystal Vernon, an examiner for Hartford, conducted a telephone interview of the plaintiff. Ms. Vernon noted that plaintiff was not being treated with a Pain Specialist. Plaintiff told Ms. Vernon that she was "in the process of finding a[n] OB-GYN" for her bladder and bowel problems. Plaintiff confirmed that she was not "being seen by an orthopedic" physician and that she did not return to Ozarks Neurosurgical Associates after the

September 2007 x-ray.  Plaintiff acknowledged that she could lift some things, like "a bag of sugar."

    \*   In November of 2007, Hartford requested that Dr. Burnett complete a questionnaire concerning the plaintiff's condition.  Dr. Burnett noted that the plaintiff is capable of "No work"; and stated that she has "cervical stenosis and degenerative disc disease".  Dr. Burnett described plaintiff's condition as "worsening" and noted the current treatment plan as "epidural steroids" and that plaintiff was "still considering surgery."

    \*   Hartford referred plaintiff's file to Hartford's Special Investigation Unit to conduct video surveillance.  The Special Investigation Unit hired a third party to conduct video surveillance.

    \*   Hartford conducted video surveillance in December of 2007.  Over the course of two consecutive days in December 2007, the video surveillance showed plaintiff away from her house for over eight hours combined.  During plaintiff's time away from home, the video surveillance shows that she stood, walked on level and sloped surfaces, drove, carried a purse, shopped, bent, reached, climbed stairs, and dined in a restaurant.

    \*   On the first day of video surveillance, plaintiff was observed entering/exiting and driving a motor vehicle.  "She drove to an unknown building in Viola, AR.  She then drove to the fire department in Viola and then to her residence.  She drove to a

9

service station where she put fuel into her vehicle.  She drove to Dollar General in Ash Flat, AR and to Wal-Mart in Ash Flat, AR. She was observed and filmed inside of Wal-Mart looking at TV's. . . . She drove to a private residence believed to be her daughters before driving in the direction of her residence.  On this date, [plaintiff] was away from her residence for approximately 5 hours."

* On the second day of surveillance, plaintiff was observed away from her residence for approximately 3.75 hours. Plaintiff "rode as a passenger to a church and restaurant.  She was observed and filmed entering/exiting and riding in a motor vehicle.  She was observed and filmed walking, climbing stairs and opening a door."

* In January of 2008, plaintiff saw Dr. Erik Schultz, an OB-GYN and complained of symptoms of "stress incontinence."  Dr. Schultz notes that plaintiff "has had two anterior and posterior repairs."  Dr. Schultz lists Fosamax, Levaquin, Nexium, Premarin, and Singulair as the plaintiff's medications.

* Plaintiff returned to Dr. Schultz on February 6, 2008. She presented for a follow up of her annual exam and the report states that she wished to discuss hormone therapy.  Dr. Schultz ordered a postmenopausal hormone panel and then prescribed hormone therapy.  Dr. Schultz also noted that plaintiff's bone-density test was positive for osteoporosis.

* Plaintiff saw Mr. MacKercher in February of 2008.  She presented with complaints of abdominal pain.  Dr. MacKercher

10

ordered a CT scan of the plaintiff's abdomen and pelvis.  The results were "unremarkable."

\* Plaintiff returned to Dr. Burnett in late February of 2008.  Plaintiff requested that Dr. Burnett switch her from Vicodin to a different pain medicine because she thought the Vicodin was "harsh on [her] stomach" and made her a "zombie."  Dr. Burnett prescribed Ultram.

\* In March of 2008, plaintiff saw Dr. MacKercher's partner, Dr. Bodunrin Badejo, complaining of epigastric pain.  Plaintiff reported that her reflux symptoms were "improved by Nexium."  Dr. Badejo noted that the plaintiff had "gained 30 lbs to 40 lbs in the past one year."  He prescribed Prevalite, recommended that plaintiff continue taking Nexium, and "reassured [plaintiff] regarding the chronicity of the pain and the lack of significant findings on recent imaging studies."  Dr. Badejo stated  "It is unlikely that the patient's symptoms are due to any significant intra-abdominal pathology."

\* In a letter dated March 21, 2008, Hartford wrote to plaintiff and reminded her that to receive long term disability benefits beyond March 23, 2008, she would need to qualify under the policy's "Definition of Disability."  Hartford also stated that it would continue to evaluate plaintiff's claim and that any long term disability benefits it paid beyond March 22, 2008 should not be construed as an admission of continued liability.

\*     On March 26, 2008, plaintiff and her husband met with an investigator for Hartford, Mr. Fitzgerald, in their home. Plaintiff was shown the surveillance video which had been taken of the plaintiff.  During the interview, the investigator observed:

\*\*     "that the [plaintiff] got up and down in one fluid motion, from a seated to a standing position several time throughout the 3 hour interview process.  She stood up slowly and the [plaintiff's] only indication of experiencing some level of pain or discomfort was the [plaintiff] frequently changing her sitting position and alternating between siting, standing and walking around the room."

\*\*     "During the interview, the [plaintiff] appeared to have good use of her hands and fingers.  The [plaintiff] was able to shake hands, hold assorted paperwork/claims documents, use and write with a pen . . . ."

\*\*     "The [plaintiff] was alert, very cooperative, and able to articulate her answers to all of the questions and [the investigator] did not observe any type of cognitive difficulties or concentration type problems. . . ."

12

> > **       "The [plaintiff] stood up and excused herself twice
> >           during the interview to go to the bathroom.   She
> >           did so with no sense of urgency."

> *    Plaintiff acknowledged that the surveillance video was accurate in that its "documented activities represent[ed] [her] level of functionality on one of [her] very good days [when she] was wanting out of the house."

> *    During the interview, plaintiff signed a statement reflecting the information she provided to the investigator.   In the statement, plaintiff claimed:

> > **       "The disabling medical condition that prevents me
> >           form returning to work are/is Bladder and Bowel . .
> >           . Problems and Degenerative Disc Disease in the
> >           cervical area."

> > **       "My symptoms for Bladder and Bowel problems include
> >           uncontrollable and frequent urgencies to urinate
> >           and to have a bowel movement.  I must wear a pad.
> >           I had to get up three times last night to go to the
> >           bathroom. . . . I have a constant stabbing pain in
> >           my stomach."

> > **       "My symptoms for Degenerative Disc Disease in the
> >           cervical are that I suffer from headache all the
> >           time. [sic] They may be caused partially by my
> >           sinuses.  The everyday headaches last for hours

until I take medications and lay down.  I have a big ball of fire pain in my neck, down my shoulders and also into my head region.  I have dull pain in my legs but I have worse jerking in my left legs. When my leg goes to jerking like (a restless leg syndrome pain) the pain is sharper.  The pain is worse when I sit for long periods (over 30 minutes) of times."

** The specific duties that I am no longer able to do at any occupation are I can not pull heavy (30-40 pounds) equipment.  I can not sit for long periods of time and definitely can not move my neck and head and look at the belts and machinery.  The lifting restrictions of 10 pounds limited what I could do."

** "I have one or two days a week that I can function without rely [sic] on others.  I can go to the doctors or shopping on these days.  I prepare myself by resting and medications on those days that I have to go out."

** "I do wear pads daily because of my incontinence. I have difficulties getting to the bathroom about every 2-3 days.  I also suffer from leakage daily."

14

** "I will use a pain scale of Zero (0) to Ten (10) to describe the level of my pain . . . My normal average daily pain level is a 7 in my neck, shoulders, legs and stomach.  I have a constant stabbing pain in my stomach if I were to perform any activities."

** "I am able to walk a maximum of 100 yards on uneven ground.  I can walk more easily on level ground or inside.  It takes me 10-15 minutes to walk that far.  My gait can be described as slow.  I do walk with a limp about 25 percent of the time.  When I have walked 15 minutes, I then have to sit down and rest because of my neck, arm and leg pain.  The pain in my arm is now located more in my right side.  My pain level increase [sic] from a 6-7 to 9 when I have walked that far/long.  I am able to walk enough to take care of my daily activities, such as running errands and going to appointments once a week."

** "I am able to stand for a maximum of 10-20 minutes. When I stand for 20 minutes, I then have to move because of my neck, arm and leg pain.  I experience a pain level of 8-9 when I stand that long."

15

** "I am able to lift and carry items that weigh a maximum of 10 pounds. I am only able to lift and carry that amount of weight because this is my restrictions of my bladder and bowel and I get a pulling in my neck. An example of something that I can carry without being uncomfortable is a gallon of milk. If I tried to lift and carry more than that I would experience a pain level of 9 in my stomach and neck area."

** "I am able to bend or flex forward to touch the floor for short periods of time. When I bend or flex forward to the floor, I experience a pain level of 8 in my neck arms, head and arms."

** "I am able to twist at the waist . . . to the right some . . . to the left some. I am able to twist or turn my head to the left slightly . . . to the right slightly. If I twisted at my waist I would experience a pain level of 9 due to the pulling in my bladder and stomach area. I would experience a pain level of 9 in my neck when I twist my neck. I use the rear view mirror when I drive."

** "I am able to squat to sit in a chair, on a toilet, or to the floor. If I squatted I would experience a pain level of 9-10 in my neck, legs, stomach and

16

arms.   To get back up from a squatted position, I would need assistance from someone or have to hold onto something."

\*\*   "I am able to kneel.   If I knelt down, I would experience a pain level of 8-10 in my neck, legs, stomach and arms.   To get back up from a kneeling position, I would need assistance from someone or have to hold onto something."

\*\*   "I am able to push and pull something that offers light resistance.   An example of something that I can push or pull is a shopping cart ½ full, a vacuum sometimes, sweep, or a chair from under a table. . . . The act of pushing and/or pulling increases my pain level to a 9 in my neck, stomach, legs and arms."

\*\*   Plaintiff noted that she could climb 4-5 steps. She also stated that she had an inability to keep her balance because of blurred vision.

\*\*   Plaintiff reported that she had full use of her hands and that she could "open a jar or a bottle," button, use a zipper, and use keys to unlock a door.

\*\*   Plaintiff stated she is able to write; but not type "because I can not hold my hand to type."

17

\*\*    Plaintiff stated that her hearing is not very good; and, that she slurred her words when she got tense.

\*\*    Plaintiff stated that she is not able to concentrate because of increased head ache pain - affecting things such as spelling and name recollection.

\*\*    Plaintiff claimed that she had beginner computer skills.

\*\*    Plaintiff claimed that she could drive about 40 minutes – with driving being limited by pain in her neck, stomach, arms and legs.  The plaintiff is able to pump her own gas.

\*\*    Plaintiff reported being able to shop "at a grocery store, mall, or large store such as Wal-Mart" for a maximum of 1 ½ hours.  The plaintiff also reported being able to attend a 2 hour church service.

\*\*    When asked to describe a typical day, plaintiff reported that she would "get up around 7:00AM and I dress, bathe and clean up.  I will eat breakfast or we will out go for breakfast.  I come back home and rest.  I will make my bed on my good days.  My husband will help me.  I piddle around the home and I will run a dust rag for 10 minutes.  I try to

18

keep my self busy but I have to take frequent rest breaks.  I will unload the dishwasher."

** Continuing on her typical day, "In the afternoon I eat a sandwich or soup.  I try to find something to fix for supper.  I cooked a roast in the crock pot yesterday.  I try to keep busy talking on the phone to other church members.  I haven an ear piece that I use.  I may watch some TV."

** "In the evening I eat dinner.  I clean up after dinner with my husband.  I try to relax and watch TV until bed time.  I may fall asleep in my chair. I typically go to bed around 10:00 PM and fall asleep around 11:00 - 12:00.  I may have to take a Benadryl to fall asleep."

* Hartford wrote to Dr. Burnett, Dr. MacKercher, and Dr. Schultz regarding the investigation of plaintiff's functional capabilities.  Dr. Schultz and Dr. MacKercher responded that they would defer to Dr. Burnett.  Dr. Burnett did not respond.

* Hartford referred the claim file to Medical Advisory Group LLC for an independent records review and requested that Medical Advisory Group attempt to interview Dr. Burnett.  Medical Advisory Group assigned Dr. T. James Hallee, who is board-certified in internal medicine and nephrology, to conduct the review.

19

*    Dr. Hallee watched the surveillance video and reviewed the investigator's report.  Dr. Hallee noted that the plaintiff has cervical disc disease with radicular symptoms into her arms, "but not of a degree that has led to any suggestion for surgery."  He further noted that "[h]er symptoms are present, but not severe enough that she takes any pain medication on a chronic basis.  She has basically learned to live with the problem and avoiding activities that exacerbate her neck pain."  Dr. Hallee also noted that plaintiff's chronic gastrointestinal complaints, functional bowel problems, and urinary stress incontinence.

*    Dr. Hallee noted that the "video surveillance shows a quite active woman who is able to do numerous activities of daily living easily and without any need for support.  She independently is able to drive her car, climb up and down stairs, and open doors without any difficulty."

*    Dr. Hallee interviewed Dr. Burnett who acknowledged that plaintiff "could likely do [sic] work that did not involve walking and standing all day . . . ."  Dr. Hallee reported that Dr. Burnett considers the plaintiff "disabled from her job that she used to have, but had not thought about her pursuing other work that would fit her limitations."  Reportedly, Dr. Burnett "had no objections to her pursuing other employment within her limitations."

*    Dr. Hallee concluded "based on the medical evidence presented for review, the video surveillance and conversation with

Dr. Richard Burnett, that [plaintiff] retains the ability to do full-time work" with certain restrictions. Dr. Hallee stated that plaintiff "should avoid activities that cause her to look up . . . repeatedly on a frequent basis. She should avoid prolonged periods of walking and standing. Due to her stress urinary incontinence, she should be allowed access to bathroom facilities on a regular basis." Dr. Hallee noted that "[t]here is no limitation of the use of her fingers, hands and arms."

*    In May of 2008, Susan Marquis, a rehabilitation clinical case manager for Hartford, completed an Employability Analysis Report. The report identified three occupations plaintiff could perform that were "prevalent in the state economy for Arkansas": Bite-Block Maker, Eyeglass Frames Inspector, and Plate Gauger.

*    In a letter dated May 16, 2008, Hartford notified the plaintiff that it was denying further long-term disability benefits because it had concluded that she was not disabled under the "any occupation" standard -- finding she was "not disabled from performing the material and substantial duties of any occupation for which [she was] qualified by education, training, or experience."

*    Plaintiff retained an attorney and appealed Hartford's decision. In October of 2008, the attorney, Lane Strother, provided new medical records and a letter from Dr. Burnett that stated that plaintiff would "remain totally disabled from any occupation for her lifetime."

\*      The new medical records provided by Mr. Strother include:

\*\*   Medical records evidencing the plaintiff's treatment by Dr. Brad Thomas, a neurologist, in August of 2008.  Then, plaintiff complained of increasing neck and back pain and numbness and weakness in her left leg.  After reviewing the prior MRI's, Dr. Thomas concluded that plaintiff had "some degenerative changes that would be consistent with arthritis but no significant disc herniations that [were] causing any canal impingement, foraminal impingement or cord impingement."  Dr. Thomas commented that "the main issue [was] degenerative in nature with arthritis medications [and] treatment with epidural steroid injections."  Dr. Thomas stated that plaintiff was "a reasonable candidate for long-term disability."

\*\*   Medical records evidencing that plaintiff had undergone a "coronary artery bypass grafting [times two]" due to unstable angina and congestive heart failure.

\*      Hartford's appeals unit referred the plaintiff's file to MES Solutions for a second medical review.  Hartford requested that MES Solutions interview Dr. Thomas and Dr. Burnett.  MES Solutions assigned Dr. Deepak Awasthi, who is a board-certified in neurological surgery, and Dr. Mark Friedman, who is board-certified

in internal medicine and holds a speciality in cardiovascular disease, to conduct the review.

   *   After watching the video surveillance, Dr. Awasthi noted that the videos showed the plaintiff's ability "to perform the routine activities of daily life without difficulty."

   *   After watching the video surveillance, Dr. Friedman noted that plaintiff was seen engaging in various activities "without difficulty" and demonstrated that she could "do most activity without orthopedic or neurologic limitations."

   *   Dr. Awasthi contacted Dr. Thomas.  Dr. Thomas told Dr. Awasthi that plaintiff's neck pain was "getting worse" and was caused by "degenerative disc disease."  Dr. Thomas opined that the plaintiff was disabled as a result of pain.  Dr. Thomas stated that if plaintiff "could get over her pain; she could be a functional person."

   *   Dr. Friedman contacted Dr. Burnett.  Dr. Burnett stated that the plaintiff "had recovered well from her [heart] surgery." While Dr. Burnett believed that the plaintiff "was functionally impaired, from a cardiac perspective, from the time of surgery on 10/17/2008 until her full recovery in mid-December 2008," "Dr. Burnett indicated that [the plaintiff] did not have any ongoing active cardiac abnormality and that her history of mitral valve prolapse and GERD was not causing acute problems."  "Dr. Burnett stated that [the plaintiff's] ongoing limitations and restrictions were related to her history of neck and back pain from her

degenerative joint disease." Dr. Burnett opined that he did not believe that plaintiff could "return to a work environment in any capacity due to her degenerative joint disease."

* Dr. Awasthi and Dr. Friedman provided a joint report. Dr. Awasthi concluded that plaintiff was "mildly impaired due to her degenerative disc disease and cardiac history." Dr. Awasthi noted that Dr. Thomas could not point to any physical finding that was leading to [the plaintiff's] disability; he felt that the pain was the limiting factor." Dr. Awasthi concluded that the plaintiff's "work capacity would be a light category with lifting up to 20 pounds occasionally; occasional bending and twisting and climbing; [and] sitting/standing/walking up to 2 hours at a time with short breaks in an 8 hour day." Dr. Awasthi also noted that plaintiff could drive and could occasionally reach above the shoulder, squat, crouch, and kneel. Dr. Awasthi stated that "[t]he light level is due to [the plaintiff's] degenerative disc disease, cardiac history and persistent pain."

* Dr. Friedman found that "[f]rom 5/16/08 until October 2008, [the plaintiff] did not have any cardiac or internal-medicine issues that would have resulted in functional impairment." While Dr. Friedman noted that plaintiff could not have worked from October 2008 until December 2008 because of her cardiac surgery, he found that "[f]ollowing her recovery from CABG surgery, from a cardiac and internal medicine perspective, [the plaintiff] would be

24

capable of working full-time in up to a light capacity." Dr.
Friedman found that plaintiff should not lift over 20 pounds but
that she would sit, stand, walk, and engage in fine motor activity
without any restrictions.

    * In a letter dated January 12, 2009, Hartford notified
plaintiff's attorney that Hartford's appeal unit affirmed the
plaintiff's termination of benefits. According to the letter,
Hartford upheld termination of benefits after they "independently
and thoroughly reviewed the policy provisions and the medical
evidence . . . ."

    * On January 11, 2010, plaintiff filed this lawsuit.

## Discussion

    5. **Standard of Review** -- ERISA provides a plan beneficiary
with the right to judicial review of a benefits determination. *See*
29 U.S.C. § 1132(a)(1)(B). A denial of benefits by a plan
administrator must be reviewed *de novo* unless the benefit plan
gives the administrator discretionary authority to determine
eligibility for benefits or to construe the terms of the plan, in
which case the administrator's decision is reviewed for an abuse of
discretion. *See* Firestone Tire & Rubber Co. v. Bruch, 489 U.S.
101, 115 (1989).

    Here, the policy gives Hartford "sole discretionary authority
. . . to determine . . . eligibility for benefits and to interpret

the terms and provisions of the Policy."  However, the plaintiff argues that a conflict of interest created because Hartford both determines whether an employee is eligible for benefits and pays benefits out of its own pocket affects the standard of review in the instant case.

The Supreme Court has clearly identified such a conflict of interest; however, in Metropolitan Life Ins. Co. V. Glenn, "the Supreme Court clarified that the existence of a conflict of interest is 'one factor among many that a reviewing judge must take into account' when determining whether a plan administrator has abused its discretion in denying benefits." Khoury v. Group Health Plan, Inc., 615 F.3d 946, 953 (8th Cir. 2010)(citing Metropolitan Life Ins. Co. v. Glenn, 128 S.Ct. 2343, 2351 (U.S. 2008)).  The Court, in Glenn, found that the conflict of interest should be weighed more heavily "where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration."

Accordingly, Hartford's decision will be reviewed for an abuse of discretion, with the "conflict of interest" being weighed as a "factor in determining whether there is an abuse of discretion." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989).

Under the abuse-of-discretion standard, the Court must determine whether a reasonable person could have reached the same

decision.  *See* <u>House v. Paul Revere Life Ins. Co.</u>, 241 F.3d 1045, 1048 (8th Cir. 2001).  This inquiry focuses on the presence or absence of substantial evidence supporting the administrator's decision.  <u>Id.</u>  While the administrator's decision need not be supported by a preponderance of the evidence, there must be "'more than a scintilla.'"  <u>Id.</u> (citations omitted).  Both the quantity and quality of evidence may be considered.  *See* <u>Norris v. Citibank</u>, 308 F.3d 880, 884 (8th Cir. 2002).

6.  **<u>Denial of Benefits</u>** – In its ultimate decision, Hartford found that plaintiff was not disabled under the "any occupation" standard as established by the Policy.  Hartford concluded that the plaintiff could engage in a light, sedentary, occupation, given her level of function.

As set forth above, the decision to deny coverage is being reviewed by this Court for abuse of discretion.  Under the abuse-of-discretion standard, the Court must determine whether a reasonable person could have reached the same decision.  *See* <u>House v. Paul Revere Life Ins. Co.</u>, 241 F.3d 1045, 1048 (8th Cir. 2001). This inquiry focuses on the presence or absence of substantial evidence supporting the administrator's decision.  <u>Id</u>.  While the administrator's decision need not be supported by a preponderance of the evidence, there must be "'more than a scintilla.'"  <u>Id</u>. (citations omitted).  Also, because here Hartford both determines

whether an employee is eligible for benefits and pays benefits out of its own pocket, that "conflict of interest" is a factor to be considered.

Upon its review of the matter, the Court concludes that the information before Hartford was sufficient to support its decision to deny coverage. *See* House v. Paul Revere Life Ins. Co., 241 F.3d 1045, 1048 (8th Cir. 2001).

The record shows that, based upon the entirety of plaintiff's medical records, Hartford concluded that plaintiff could perform the duties of certain light, sedentary occupations. Hartford's decision was supported by the opinions of three physicians who were asked to perform independent medical reviews of the plaintiff's case. Although plaintiff argues that the doctors hired by Hartford did not physically examine the plaintiff, "plan administrators are not obliged to accord special deference to the opinions of treating physicians." Black & Decker Disability Plan v. Nord, 538 U.S. 822, 825 (2003).

Plaintiff argues that Hartford abused its discretion in denying the plaintiff's benefits because the plaintiff had been approved for Social Security Disability and because Hartford did not properly consider the Social Security Administration's award of benefits. However, the Court is not persuaded by these arguments since Hartford's decision letter states that its denial was based

on "all of the documents" in plaintiff's file and "an ERISA plan administrator or fiduciary generally is not bound by a SSA determination that a plan participant is disabled, even when the plan's definition of disabled is similar to the definition the SSA applied." Rutledge v. Liberty Life Assur. Co. Of Boston, 481 F.3d 655, 660-61 (8th Cir. 2007)(citing Farfalla v. Mutual of Omaha Ins. Co., 324 F.3d 971, 975 (9th Cir. 2003)).

Finally, although there is a purported "conflict of interest" due to Hartford's financial interest in this claim, the Court finds no evidence to support the argument in this case that the "conflict of interest" weighed in in Hartford's decision at all.

In light of its review of the matter, the Court cannot say that Hartford was unreasonable in its denial of coverage. "'It is not unreasonable for a plan administrator to deny benefits based upon a lack of objective evidence.'" Manning v. American Republic Ins. Co., 604 F.3d 1030 (8th Cir. 2010)(citations omitted).

7. **Conclusion** –- Based on the foregoing, the Court concludes that plaintiff is not entitled to a judgment against the defendant and that her claims against defendant must be dismissed.

Accordingly, plaintiff's **Motion for Summary Judgment (Doc. 11)** must be denied.

The Court further concludes that **Hartford Life and Accident Insurance Company's Response to Jannette Neal's Motion for Summary**

Judgment and Cross-Motion for Judgment on ERISA Administrative Record **(doc. 14)** should be granted and that each party should be required to bear its own costs and attorney's fees.

**IT IS, THEREFORE, ORDERED:**

\* that plaintiff's **Motion for Summary Judgment (Doc. 11)** is **denied**; and

\* that **Hartford Life and Accident Insurance Company's Response to Jannette Neal's Motion for Summary Judgment and Cross-Motion for Judgment on ERISA Administrative Record (doc. 14)** is **granted**; and

\* that each party shall bear its own costs and attorney's fees.

**IT IS, FURTHER ORDERED** that, in light of the foregoing, this case should be, and hereby is, **DISMISSED.**

IT IS SO ORDERED.

/S/JIMM LARRY HENDREN
JIMM LARRY HENDREN
UNITED STATES DISTRICT JUDGE